Thank you, Your Honor. May it please the Court. The struggle for worker rights in the Port of Baltimore used to be a fight of David v. Goliath, the union worker v. management. The Baltimore longshoremen, however, never imagined that one day they'd have to fight for those rights, not only against management, but also against their own international union. But that day has arrived. In this appeal, the longshoremen of the Port of Baltimore respectfully ask this Court to restore the rights of the individual dockworkers to where those that will be arguing today that were dismissed at the district court level with permission. I thought the local was dismissed and that part is not appealed. Pardon me? I thought the local was dismissed. Correct. So the local of the longshoremen are not a party here. That's correct, Your Honor. But would you say the longshoremen, you're referring to the membership rather than the union? That's right. The individual plaintiffs rather than the local itself as an institution. That's correct, Your Honor. However, the amended complaint does still involve three different counts, and that's what I was making reference to. Our arguments will address all three of those counts that were dismissed. I'll be presenting arguments as to why that decision should be overturned. With your permission, we'll start with count two. Count two was our claim under section 301 of the LMRA in which the claim of what we call the new members, the 500 members who were admitted in 2000 and 2014, should be admitted. The district court granted defendants motion to dismiss on the grounds that our plaintiffs lack standing to be able to bring their claim. Of course, a claim under section 301 of the LMRA is a contractual claim. Our point is that our plaintiffs absolutely have standing to bring that claim because they are in fact members of the ILA, of local ILA. That indeed is the very issue that was presented to the court. They were approved by the membership in the same process and procedure as all members of local 333 have always been approved. They say they didn't take a vote, right? They did not take a vote on the specific names of the applicants. However, the membership did at a general membership meeting approve the action of the executive board to begin to process these new members. And in fact, I wanted to point out in the record where that occurs. Before you do that, I don't want to spend really any time on this, but I'm just moderately concerned as to whether you have a conflict here. I know, it's kind of a weird question. Can you actually represent under the circumstances of the amended complaint and the allegations here, can you actually represent the actual members, the former executive board members and so forth, and this other group who are maybe members, maybe they're not, and this issue about whether they were going to get reimbursed or whether they waived reimbursement. It strikes me as just terribly, terribly messy for one lawyer to be standing before the court purporting to argue on behalf of these two different groups of people. I'm sorry, Your Honor, I'm not sure that I share the court's concern. If there is a concern, in fact, the concern would be with respect to Local 333 at the institution which was dismissed from this case. Jennifer Stare was the attorney who represented the institution, Local 333. I'm talking about the two groups of individuals. I understand. Well, what I represent is the group of former executive board members who were removed from their position. And there's no question they were and are members. That's right. There's no dispute. There's no question about that. That's exactly right. Then there's this other group, this large group, who purport to be appellants here. That's right. Well, I don't think there's any dispute. I think even the defendants accept that they are appellants here and aren't challenging that they're appellants. Right, I shouldn't say purport. They are indeed appellants here. But I don't see a conflict. I don't see a conflict because, Your Honor, the fact is that the claims that are being brought, claim number one is a challenge to the imposition of the trusteeship. We know that that challenge as a challenge to the trusteeship is now rendered moot. We understand that we can't go back in time. However, that claim is still alive because there's a claim for damages. There's a claim to recover money that was spent during trusteeship. The point being that certainly the seven, the former executive board members, those who are actually undisputably members, certainly have standing to be able to challenge the trusteeship and the damages there. Our contention is that the 500, what we're calling the new members, because we contend that they were properly admitted, then they also are members who have standing to challenge that trusteeship. The count number two is the count that really, at its focus, is our claim that those individuals were in fact admitted as members. So I don't see a conflict between the two. The seven are front and center in count number one. The other 500, if they are members, belong in count number one. Count two is really about the status of the 500. Are they in fact members? Were they properly processed? So I don't see a conflict between the two groups. At the end of the day, I think the proper decision is the 500 were properly admitted, they are members, and then at most for the court to decide is count one, do we have damages because of money spent during the trusteeship? And then count three, does the Judge Harvey decree, should that be enforced? I take it in any event, those fees have been reimbursed to them? Well, in fact, what's happened, Your Honor, once the trusteeship was imposed, the trustee offered to return those fees to the individuals. The individuals didn't want them back because the individual members, what we call the new members, these 500 members, contend that they were properly admitted as members. So if they lose, are they going to get them back? Are they going to then accept the offer? You see how messy it is? Well, again, I'm not sure I see it as messy. If they lose and they're out of appeals and there's no dispute, then they get their money back. But they don't want to waive that while they are still contending that they are members. Now, in fact, what's interesting... Why are you so sure they get their money back if they've already rejected the tender? Well, if the money was paid for them to be members, and it was an initiation fee and initial dues, then, of course, it's their money. It's the union's money if they paid it and are accepted as members. But I thought that there was this waiver of any claim to reimbursement. There is a waiver. It's not disputed, is it? Genuinely? No, Your Honor. There's no dispute that they signed that waiver. But really, what's more apropos, Your Honor, is that since the filing of this appeal, since it's been fully briefed, the union itself, the ILA International, and the trustee have admitted over 200 of these 500 into membership without any vote with their names identified of the general membership and a vote. Were these old members ever voted on? I thought they weren't voted on either. Right. Nobody's ever been voted on. My point is, the ILA International... But you're distinguishing it on whether there was a vote, and then you say no vote's ever been voted on. Only, Your Honor, because the ILA International's position, that the appellee's position is, the whole reason for the trusteeship, the whole reason for the rejection of these 500 as members, is because there was never any vote of the individual applicants. My point is that even under trusteeship... Well, under that theory, there's no members at all. Exactly. That's my point. It's an absurd... That's your argument, that there's no members? You've been talking about old members and new members. No. Or you're saying there's no members? My argument is that the defendants, the appellee's position, would lead to the conclusion that there have never been any members, and there are no members, and I'm saying that's an absurd result. So everybody's entitled their money back? And nobody should be entitled their money back because all of them are members. The whole point is... I thought you said none of them are members. No. The ILA International, the appellees are saying that they are saying that without a vote, you can't be a member, and by... The International's saying there are no members. I'm sorry? The International's saying there are no members? Well... You don't represent the International, but the ILA International... I would... That's how you characterize it? The part that's murky to me is how the appellees can hold their position with that irreconcilable conflict. I don't think they can. The fact is that even after the trusteeship was imposed, over 200, approximately 220 of the individuals who we claim were already members without an affirmative vote of the individual names of those individuals that they were already members, the trusteeship said, yeah, okay, we'll let 220... It's accurate, though, that the dismissal here was predicated on the distinction between the, quote, old members and, quote, the new members. That's right. The new members weren't members, and the old members were. That's right, and I don't believe that that position is tenable. Was a vote necessary under the trusteeship? Well, my contention is that it... Who would vote? Well, the members themselves were still members of Local 333, even under the trusteeship, so those members would still vote. It would be the same people... So your argument is that to admit new members during the trusteeship, the trustee was required to actually call a meeting of the membership before any new members could be admitted if this requirement of the bylaws had efficacy? That's right. If that interpretation, if their interpretation of the bylaws means what they say it means, which is affirmative vote, here's the list of people who are applicants, who are in favor, who are against, my contention is they would have had to do that during the trusteeship as well. It's in the bylaws, but they didn't do it. Our position is that that's not what the bylaws ever required. What the bylaws required was that the members approve the process of approving the membership, and, in fact, I've got citations to the record where that's exactly what happened here. The Court is already familiar with the fact that Harold Daggett, President of the International, back on November 19th of 2013, joined Appendix 348. It required the admission of two members. It said you must admit these two members. On July 2nd, 2014, joined Appendix 350. He again wrote saying, why isn't one of these members admitted yet? You must admit them. On July 10th, 2014, Mr. McKenzie, then President of Local 333, sent a letter that was written by Jennifer Stare, attorney for Local 333, that said, Mr. Daggett, if you're requiring us to admit these members, understand, we have a whole bunch of other applicants that are in line, and if we have to admit your two, we have to admit all the others. And a copy of that was sent to the ILA Executive Committee. The whole Board got it. Nobody objected to it. Counsel for ILA International said, I think we have a process for going forward. That's at Joined Appendix 352. The Executive Board of Local 333 approved that letter, saying, if you're going to let in these two, if you make us let in these two, we've got to admit the whole rest of the applicants. That's at Joined Appendix 357. And so on July 16th, the Executive Board approved that process. On August 5th, the Local 333 General Membership Meeting approved those Executive Board's actions. They approved the minutes at Joined Appendix 361. Now, there was discussion. Jeff Vogel questioned the membership process. There was discussion. This was not in a Mayflower moving band in the middle of the night. This was discussed at a membership meeting. And the General Membership approved this process. That's at Joined Appendix 361. On September 2nd, 2014, at a Local 333 General Membership Meeting, they approved the August 5th, 2014 minutes. That's at Joined Appendix 365. There are notes in those minutes that say that Union Member Barkhorn objected about, he said that there's a race ratio requirement. He didn't object to the whole process of letting in the additional members, said there's a race ratio requirement. And Mr. McKenzie said, look, that's unlawful and not. What does that mean, race ratio? For every black member who's admitted, we have to have a white member admitted. Mr. Barkhorn is Caucasian. Who said that? International said that? I'm sorry? Who said that? Mr. Barkhorn, who is a member. Mr. Barkhorn is the one who said that. And he's the one who then, after this process was approved by the membership, as demonstrated in the Joined Appendix, he's the one who then filed the complaint, the charges against Mr. McKenzie, that led to the decision which brought in the trusteeship. The 500 people, is there anywhere in the record that gives the race of those members? In the record? Not that I know of. In a case like this where you bring up the Consent Decree of 1970, why not? You're bringing this up. Why is that demographic not in the record? I'm just asking you. I'm not sure. I don't think anybody asked you that question. Well, what we certainly have, Your Honor, is a percentage membership. And I see I'm out of time, if I may just complete my answer. We do have in the record the general percentage of the race of Local 333. That's in the record? I believe it is, Your Honor. The general percentage. That seems like it's kind of qualified. Well, I understand that, Your Honor. And what is it then? I believe that Local 333 is approximately 60% African American. I believe that that's the number. Is that counting the 500 and everybody before that? No, I believe that that is the percentage without the 500. What's the 500? I don't know, Your Honor. So you don't know what the percentage is? No, Your Honor. The issue of Count 3, which is the Judge Harvey Decree, is a challenge that was being made. You had to make some allegations in the complaint about that to get into that Count 3? Allegations about the racial percentage? Right. You bring that up, the consent decree. Wouldn't you have to put that in in terms of whether or not that would trigger a continuing condition that might impact the decree? Yes, Your Honor. Why is it not there? Well, the fact that the Judge Harvey Decree focuses on the racially discriminatory impact and the fact that we've alleged that this is a majority African American local are the allegations that we presented. Thank you, Your Honor. All right. Thank you. Mr. Maronin. Morning, Your Honors. My name is Kevin Maronin. I represent the International Longshoreman Association and its individually named executive officers. I'd like to confine my responses to the dismissal of Counts 1 and 2 and my colleague, Mr. Collins, will address Count 3 if that pleases the Court. Your Honor, this case arises out of two union disciplinary hearings that resulted in the imposition of a trusteeship over Local 333. Could you put that mic a little closer to you? Thank you. In November 2014, the ILA placed the local under trusteeship for basically three reasons. One, the local had tried to admit over 500 applicants in violation of a directive from the membership that they not take in any new additional members pending the resolution of the contract ratification vote. The second was that the members had never been approved as is required by the local bylaws. And the third was that for the first time, the local had required each of these individuals to sign a waiver that Your Honor referred to. And the waiver basically said, I realize I'm paying $2,195 in an initiation fee and quarterly dues and I realize I may never get this money back. I waive my right to get this money back despite the fact there may be no work for me, despite the fact that I might not pass the drug and physical exam, and despite the fact that I may never get PIT training, which is until you get PIT training, you really can't work in the Port of Baltimore and get hours, which lets you earn a living and get wages. This had never happened before. The international placed it in trusteeship because suddenly you have a local that basically has 700 to 800 people working. Now you're trying to bring in 500 people and you're trying to say, look, all these people are going to be met. All these people are going to enjoy the privileges of membership, but they can't work. So what are the privileges of membership they're going to enjoy? The right to vote on the collective bargaining agreement or right to vote in the union election? Your position was they didn't need a new member? I'm sorry, Your Honor? Your position was they didn't need any new members? No, my position was the members of 333. Well, you say there are 700 or 800. Is that the size of the union without the 500? The local had more than that, but approximately 700 or 800 are really earning a living. 700 or 800. How many did they have? They had, let's say, over 1,000. Over 1,000 absent the 500? Correct. All right. So the ILA ruled the waivers weren't proper. You didn't, the international didn't want them taking in people without getting the vote, without the majority voting on them. The international didn't want them taking in people where they're waiving their rights to get any money back. That's part of it, but you gave three reasons. And one of them is this vote thing. But the other side says nobody's ever been voted on. Nobody's ever been voted on. There is an allegation. If that's the case, then there are no members. If yours is a requirement, you can't have the requirement for this 500 and not require it for the other 1,000. I think that's an absurd result, Your Honor. You're not going to, the international, that wasn't the charges before the international. I doubt if the international would ever say that Mr. Smith, who's been working in the port for 20 years, been paying to the international dues money for 20 years, is not a member. We were dealing with the grievance that was filed before us. And the grievance filed before us said the local had said stop bringing in new members. And no one disputes that. And for the first time, you bring in 500 new members and you make them sign a waiver form. And the international said, why, we've never done this before. Why are we having people waive their right to get their money back if there's no work for them, if they can't get trained, and if they can't pass the test? You're putting the cart before the horse. You're making them members and they're not working. The unions aren't social clubs. They work only when they're representing members that are actually working in the port. So the plaintiff brings three claims. First, that the trusteeship was imposed for an improper purpose. Second, that the non-member plaintiffs have standing to sue the Union International for breach of its international constitution under LMRA 301. And the third, a claim of contempt. The first case that seeks to challenge the trusteeship is easily disposed of. As this court made clear on two occasions, in the Parks case and in Taylor, once the trusteeship has terminated, the claim challenging the invalidity of a trusteeship under Title III of the LMRA is moot. Other courts in the Seventh Circuit and the D.C. Circuit are in court. When did the trusteeship end? The trusteeship ended in July 2015. The local had elections in June 26 of 2015. But during the trusteeship, certain funds were expended. That's correct, Your Honor. And part of the claim here, sympathetically read under Count I, is that those funds should be restored, or at least an accounting needs to be made in respect to those funds. So if that's true, that claim is not really moot, is it, with respect to the legitimacy of the trusteeship? I'm not aware of any case that addressed it in the accounting concept, but I see if you're focused just on that in terms of the expenditure of union money. It's effectively a claim for damages, in other words. Well, there is no individual, to draw the contrast, the LMRA Title III does not let an individual claim for damages. This is a collective claim as if you're suing like a shareholder derivative. For an accounting, perhaps that does survive. But for the other in terms, you know, the trusteeship is mooted out, and you can't enjoin conduct that's been discontinued. But even if it's not moot, the lower court was correct in the dismissal for failure to state a claim. And the court held, first, to state a claim, you have to show there was a procedural problem at the hearing, and it was imposed for an improper purpose. That's following this court's decision in Becker. There clearly was notice, opportunity to be heard, and a hearing. The lower court found this much. That isn't subject to this appeal. The appellants do not appeal that. The question was whether or not there was a proper purpose, and the court held that the purpose was really conceded by the plaintiffs below. Well, is the purpose, does the proper purpose appear on the face of the amended complaint? Because this is a 12B6. Correct. Okay. But in the 12B6 context, you can not only consider the amended complaint, you can consider the exhibits that are integral to the complaint and are referred to in the complaint. And among the exhibits that the court noted was that the March meeting, the membership had given a directive to stop taking in new members. That's an exhibit to your motion, correct? That's not an exhibit to the complaint, or do I have that wrong? It's correct, Your Honor. Exhibit to the motion because they incorporate the allegations of what took place at the hearing. Well, but they don't allege. No, they don't make any allegation regarding it. They're silent about the meeting. So you supplemented the record. I don't think we supplemented the record, Your Honor. I think the court said it's integral to the. 12B6 case. But I don't think it went beyond 12B6. Your motion put in evidence. It put in the exhibits that were referred to in the allegations of the complaint. The allegations of the complaint referred to the hearings that took place on, before the committee with the trusteeship, and we referenced the exhibit that was referred to in the allegations. And the court held that was proper. A little more specific, using the term exhibit. The committee hearing. What was alleged in the complaint? What exhibit are you referring to as alleged in the complaint? It was exhibit two, and I believe it was referenced in the sense, the plaintiffs made allegations that on this particular date, the ILA held a hearing and made certain rulings imposing the trusteeship. All right. Now that's not a reference to an exhibit. No. That's an allegation of facts. Correct. And we referred to the exhibit that was referred to in the complaint. We referenced that exhibit. That's correct. What is the exhibit referenced in the? The committee hearing that they referenced in their allegations. But a hearing is not an exhibit. I'm sorry, Your Honor? A hearing is not an exhibit. Yes. A hearing is a fact in the objective world. Correct. Right? And they made reference to that fact in their pleadings. Okay. But that doesn't turn it into an exhibit. No. I'm sorry. Yes. Okay. You provided the exhibit. Correct, Your Honor. In opposition or in support of our motion. Correct, Your Honor. And the question is, is that, you know, can you do that under 12B6? Correct, Your Honor. But that was not raised in this appeal.  That's true. And the other was the waiver. The other reason for the purpose of it was the waiver. The international just said this is, we're not going to let the local take this amount of money from these individuals who have no realistic prospect of working. Now, Your Honor, we asked a question about that. What did we do? We contacted when the, it's beyond the pleadings in the case, but since Your Honor had asked about the waiver. We contacted the individuals. And individuals who had a few hours or had work, they tried to process them to get them pit training so they'd be eligible to work under the collective bargaining agreement. Since the imposition of the trusteeship, I believe we've taken in approximately 170 people. With or without a vote? During the trusteeship, there was no vote because the trusteeship was in effect. And can you point to some authority? Because counsel seemed to suggest that whether the union local was operated under a trusteeship or not, you still required a vote of the membership. The authority would be the international constitution and the provisions of federal law. When the local is placed in a trusteeship, they lose their autonomy. The bylaws are sort of preempted by the international's constitution. By the trustee. But that's why Congress. Trusteeship suspended the bylaws. Correct. That's why, though, Congress says you can only do this for 18. Is there a provision somewhere of law or in those bylaws that they'd be suspended if there's a trusteeship? Not expressly, but that's how. Not expressly. Correct. But. Not expressly. That's why Congress only lets a. The way I read the judge's opinion, the distinction that resulted in a ruling was primarily that the 500 are non-members and the 1,000 are members. Correct, Your Honor. And the 500 were supposed to be non-members, according to you all, because there had not been approval by a majority of the membership. But the fact of the matter is, as I understand it, today there's not been approval by the membership of the 500 or of the 1,000. They're all the same. They're all the same. There's no distinction between what you call the non-members and the members. So you don't have any members or everybody's a member. Well, I don't think everyone can be a member because. Well, how can you make a distinction on the basis that there hadn't been approval by the majority when the people that you say are members haven't been approved by the majority? I think the distinction among others, Your Honor, would be that the members of the local voted to stop taking in new individuals until. But they weren't members. They hadn't been approved either. Well, if we're going to. If I understand what you're saying about the facts, they hadn't been approved either. I mean, how is there a distinction between the 500 who you say are non-members and the 1,000 that you say are the members? None of them have been approved for membership by a majority of the membership. If their position is that none of them are approved for membership, that would be. I thought you agreed with that, that you agreed nobody's been approved. No. What I said, Your Honor, is that's the allegation in the complaint. Well, are you saying that the 1,000 were approved by the membership before they became members? Your Honor, I don't know what the record is, but you'd be going back to people that. . . Well, you're the counsel that we have here for the international. That's correct. And you've got to be familiar with that record. Do you say that they were approved, the 1,000 that you say are members, they were properly approved, they jumped through all the hoops that you say weren't jumped through for the 500, that they became members validly? No. What I'm saying, Your Honor, is that wasn't part of the hearing below. And the provision, and I don't know when that provision in the bylaw was first enacted, but some of these people that have been members for 40 or 50 years. . . Well, were they approved by the majority to become members? That's what I'm saying. I don't know. And I don't think anyone knows going back that far, Your Honor. But that wasn't the subject of their argument before the committee. The committee. . . Well, they weren't. They're in the same status as the 500. I don't think so, Your Honor. Why I say that is you have some people that are trying to get in the union. They've never worked. They have no hours under the industry, and they're asked to sign a waiver. You have other people that have worked in that industry under that collective bargaining agreement and been paying dues to the international for 30 years. I don't think they're anywhere near the same situation. And no one complained about it. Now you have a grievance. The international has to act on that grievance. How are they going to proceed with it? And when the international goes to that committee, you see a situation where people are paying a large sum of money with no prospect of realistically getting a job. So the international stopped the process. They contacted the people if they wanted a refund. They explained to them that they might not get pit training or the necessary training to get hired for a period of time. Since that time, they've brought in around 170 people. I think there was a questionnaire. I think I'd say around 80% of them are African American. So they've been bringing in people. But even now, years later, there's no work for 500 people. Some people didn't want their money back. Some people want to wait. Other people did take their money back. The international waived the enforcement of the waiver. They didn't care what the waiver said. It was just unconscionable, as far as they were concerned, to take the money from a person where they have no prospect of employment. Federal labor law sets up a system where it's permissible for a union to invoke a union security clause and take money from her. But it's after you've been working. You don't have people pay money when there's no prospect of employment. It was that simple. That was what was different about this group than the others, Your Honor. I see I haven't exceeded my time. I'm sorry. Oh, I'm sorry. I apologize. Thank you, Your Honors. I may please the Court. I'm Michael Collins. I represent the Steamship Trade Association, which is sued under Count 3 of the complaint solely. And also I'm going to address Count 3 as it relates to the ILA. But the Steamship Trade Association is the bargaining agent for the employers, carriers, and auxiliary companies at the Port of Baltimore. We've been sued under the Harvey Decree, a decree that was issued I think when I was 14 years old. Collins, do I understand this whole tornado to sort of put a – it all arises out of this dispute over the collective bargaining negotiations? It may have, Your Honor. The collective bargaining – May have or did? The collective bargaining agreement negotiations at the local level went on for quite some time. Right. One of the things the Court should know is, you know, Mr. Mounin is with the ILA up in New York. Right. The local is resident in Baltimore. I think we noticed the two accents. Yeah. And consequently, he may not know whether the local approved, you know, for a membership of 1,000, as you say, that were in that discussion. I'm certain that something like that did take place. But the CBA is in place now. The CBA is in place. We were able to negotiate – And it runs to when? It runs through 2018. 2018. Yeah. The CBA was negotiated. You know, the trustee took over negotiations. We reached agreement. It was a vote of the full membership of Local 333, and it was passed along with elections for a new local president and the like. What trustee was allowed to negotiate the CBA? The ILA trustee that was put in place. Who? His name – Cowan. Does that ring a bell? Pardon me? Scott Cowan is the new president of Local 333. But one person was allowed to do the negotiation, correct? Well, it wasn't just a single person. He had to seek the support of, you know, his executive – you know, he had to seek the support of people in Local 333 to move forward because ultimately it was a vote of the membership. The entire membership would vote on it. So, you know – I'm talking about the negotiations. That's different. Yeah, that's true. I mean, the actual – You only vote on what's on the table. What gets on the table comes by negotiation. That's true. Right? So who was able to negotiate? The trustee that was imposed upon Local 333 by the ILA in New York. Right. Was he white or black? He was black. He was black. What was his name? Wilbert Rowell. What was his name? Wilbert Rowell. And he's the fellow that replaced Mr. McKenzie? He is. Who was African-American? He was African-American from South Carolina. He's the number three person with the ILA, as I understand it right now, an executive vice president of some kind. Again, I represent management, so I'm not involved so much in the – You're helping us with the facts. I'm trying to, Your Honor. You're helping us with the facts. That's good. And so, you know, I guess what I'm here to argue or to discuss is, you know, Judge Harvey's decree. Judge Harvey, you know, had a particular purpose when he issued this decree. This is a suit brought by the Department of Justice to combine two locals. They were segregated at the time. The two locals opposed it, by the way. But Judge Harvey and the Department of Justice fashioned a really well-designed remedy, and they merged these locals into what is now Local 333. They set in place a seniority system. When you read it, it talks about seniority A through D. We're now on Q. They follow the same basic path all the way down. Are there differences in the seniority system? There are some differences. But for the most part, there are no material differences. And, you know, he had – and the other part of the remedy was to put a hiring hall together so that when the black and white locals mixed together that the hiring system, you know, recognized seniority, and that's how jobs were distributed at the port. Things have changed a lot since 1970, as you might imagine. Containerized cargo has made a tremendous difference. We don't have people with hooks, you know, bailing on large quantities of bulk and break-bulk cargo. For the most part, we have two kinds of cargo in the Port of Baltimore now. We have containerized cargo, and we have roll-on, roll-off type of cargo. So we are trying to professionalize the workforce, and it is true that we make new members go through pit training. That's a requirement of OSHA if you're going to operate heavy equipment in a marine environment. You have to have power industrial truck training. So we give new members who are generally unskilled 80 hours of paid training, and we put them through this course, and the course is a relatively simple course, and about 80% or 90% pass that course and they move into – become full-fledged employees potentially working out of the hiring hall until they can get a permanent job with one of the companies that is a part of the trade association that I represent. So Judge Harvey's decree, the purposes for it and all the rest were long ago remedied and instituted. I see I've only got 10 seconds left. I would just say that with respect to this idea that somehow the seniority system is corrupted in the Port of Baltimore, that nothing could be further from the truth. And if you look at the plaintiff's complaint, they're not really talking about the seniority system at all. They're talking about all these other issues, all of which are subject to a big administrative overseeing by the EEOC and the enforcement of that, not by Judge Harvey's decree. And I'd just point out, you probably know, but it was the Equal Employment Act of 1972 that allowed the EEOC to have enforcement authority. And so that's why we saw Judge Harvey's decree instituted by way of the Department of Justice's lawyers. But since 1972, the EEOC is the place where if there's discrimination or allegations of discrimination on the part of anyone at the port, that's where they go. Have you ever heard a thing about your colleague, where the advocate said, talked about someone said if you have one white member, you need one black member. Have you ever heard anything like that? This particular guy, Barkhorn, has been on the foreign management side as well. It is the contention of Judge Harvey's decree has a kind of magical thing at the port. One of the things that Judge Harvey did was he said equality for all. A lot of people, like Long Shorman, have said, well, equal means if there's a white guy, there's a black guy. Management has nothing to do with any of that. That's just simply not the case. And I can tell you that out of the largest group of local 3C members that have come through, they've been a majority African American, and that continues to be the case. I think the Port of Baltimore, or rather my association's employers, hire more African Americans to really good jobs with tremendous benefits than any employer in the state of Maryland. I think we're by far and away exceed the rest of employers in Maryland on that count. Thank you very much. All right. Thank you, Your Honors. What I wish to do is try to make three points in respect to Mr. Maronin's argument and then emphasize one with respect to Mr. Collins' point. But I'm glad that we're focusing on PITT training because, number one, when Mr. Maronin is emphasizing that we can't bring in 500 new members because there's just no work for them, that's absolutely not true for the following reasons. Number one, Mr. Maronin admitted that he himself, or the trustee, admitted 170 of these new members that there's just no work and people are seeking work and can't find work. What are you doing bringing in 170 of our 500? Oh, that's where the line needs to be drawn? The fact is that thousands of jobs have been canceled through the hiring center, through the dispatch center, every year because of this PITT training problem. The fact is PITT training, as Mr. Collins said, OSHA requires PITT training, but OSHA only requires it if you're operating a power or industrial truck. What the contract, what the parties, the ILA International and the STA, have agreed to is that PITT training must be required of every ILA Local 333 member to get any job through the dispatch center, including a job that doesn't require PITT certification. The number of jobs that actually require PITT certification is relatively small, and yet if ILA members are going to show up in the morning, go through the dispatch center, in order for them to even be assigned a job that doesn't require PITT training by OSHA, that member must, according to the ILA International and STA, have PITT training certification. So they create that bottleneck. As a result, thousands of jobs a year are canceled through the dispatch center, and then once they're canceled, they get offered to people off the pier. And then anyone, whether you're a member of the union or not, can then be selected for it. So this PITT training is the bottleneck. It's not that the jobs aren't available. It's that the PITT training requirement, which is absolutely irrational, is where the bottleneck is. And in the papers, ILA even says, they quote something that says, yeah, STA only does, they only train like 10 at a time. That's where the bottleneck is. That bottleneck shouldn't be there. That, in fact, is one of our primary contentions about Count 3 and the violation of the Judge Harvey decree. Let me ask you this question. What incentive would the International have to create a bottleneck that would allow off-dock workers to get work? The fact is that the ILA International, it's a control issue, Your Honor. It's a control issue. Local 333, if the work can simply be dispatched according to the needs of the job, meaning if it's a non-PITT training required job, then don't require the member to have PITT training, well, then the local gets to control access as it's supposed to be. But that's why in my opening I was saying it's unheard of for us. We can't believe that we're fighting the International, that the International is teaming up with the STA to control the flow of work when it should be at the local level. And this PITT training requirement is one of our primary contentions about why the Judge Harvey decree is being violated. PITT training, it's all about the seniority system. Is this a requirement in Long Beach and Philadelphia and Fort Lauderdale? No. So Baltimore is the only place where PITT training is a requirement under the CBA? And it's not even under the CBA. That's what's even worse. It's not even in the CBA. Rather, it's based on some one-page agreement that's signed by a former president of the local, never voted on by the members, never ratified by anyone. But it was coordinated, our allegation is, coordinated by the ILA president to push this through. So it's not even in the CBA. But no other port has this, is my understanding. And so Baltimore is stuck with this PITT requirement to get a job that doesn't require PITT certification. It is unheard of. And it's why we're here. Count three of the Judge Harvey decree. Is all of that in the amended complaint? Yes, Your Honor. Yes, Your Honor. Only count three? No, well, I think it's in the primary allegations. In count three, the fact that this PITT training requirement is having this discriminatory impact, this adverse impact on the African-American majority of the local is front and center in count three. But the allegation, I think, is in the main facts, if I'm not mistaken. Are you suggesting that the African-Americans don't have access to PITT training on an equal basis? What's the racial component? Again, the racial component is that local 333 is a majority African-American local, as Mr. Collins himself conceded. The only one in the country? I don't know. But this local is the only one under Judge Harvey's decree. Well, I mean, it's a question whether the decree still really exists. But my question is, I thought you just suggested that this PITT training requirement has a disproportionate impact on African-Americans. Yes, on the African- At 333. Yes. Okay. Why would that be so? How is that so? Because the local 333 is majority African-American. That's the disproportionate impact. That's not making any sense. The argument is- Are you saying that the white members of 333 are better able, better qualified, or deemed to be better able, better qualified- This isn't- Than the African-American members? Or are you just saying that because 333 is a majority African-American local, and no other local in the entire United States has this requirement, that that's the disparate impact? Well, it's not that it's the only local. From my point of view, Your Honor, it's not Baltimore versus other areas. Any other dock would have to stand on its own. It is the disparate impact on the basis of local 333 being a majority African-American local. Why don't the African-Americans take the PITT training? They try. The problem is that the STA and the ILA won't let them. Under OSHA, for example- What do you mean won't let them? Meaning STA requires that- That's not alleged. Yes, absolutely. I'm sorry, Your Honor. It is. In fact, Mr. Collins alluded to it. STA requires that admitted members of local 333 take STA's PITT training. Now, under OSHA requirements, that's not required. You don't have to take your employer's PITT training. Under OSHA, you can take a third party's PITT training. You can take anyone's PITT training. But according to the ILA International and the STA, you have to take STA's PITT training. Are you saying the African-American members of 333 don't take it because what? Not that they don't. STA doesn't train more than, according to their own figures, about 10 trainees at a time. So they can't get through the training of the admitted members. So what you've got is you've got the ILA arguing that these 500 members shouldn't be let through because there's not enough work for them. They can't get PITT trained because STA- Forget about the 500 for a moment. Okay. What about the 1,000? The 1,000 members who have been there for 40 years. This PITT training requirement only started in, I'm trying to remember now, I think it's 2009. And so- The STA and ILA hadn't come to this deal or whatever agreement- So I'm going to assume since 2009, the vast majority, since it's a majority black union, local, that the vast majority of people trained have been African-American. Is that not true? I don't know, Your Honor. Okay. I've taken you way over your time, and Judge Gregory has been very, very nice to permit us to do that. Thank you, Your Honor. All right. Thank you, counsel. Thank you for your arguments. We're going to ask the clerk to take a brief recess, and we'll come down and greet counsel. Mr. Honorable Court, I agree to recess.
judges: Roger L. Gregory, Robert B. King, Andre M. Davis